40 So.2d 845

### VICK et al. v. BISHOP.
### 5 Div. 459.

Supreme Court of Alabama.
May 19, 1949.

Felix L. Smith, of Rockford, and Richard H. Cocke, of Alexander City, for appellants.

Henry A. Teel, of Rockford, for appellee.

LIVINGSTON, Justice.

The bill is one to redeem certain described lands located in Coosa County, Alabama.

The question of primary importance on this appeal is whether the notice of foreclosure sale or the method employed by the mortgagee appellant in giving such notice is sufficient. Evidence as to the notice is found in the foreclosure deed which recites:

"Whereas, in and by said mortgage, said J. A. Vick was authorized and empowered, in case of default in the payment at maturity, of the debt secured thereby, to take possession of said property, and, after giving notice of the time, place and terms of sale, for ten days by posting notices at three public places, to sell at public outcry, for cash, to the highest bidder, and which said mortgage provided that in case of a sale under the power and authority contained in the same, the auctioneer selling said property was authorized and empowered to execute title to the purchaser at said sale; and

"Whereas, default was made in the payment of the said mortgage debt, at the maturity of the same, and said property was advertised and sold in all respects as provided in said mortgage on the 19th day of January, 1943, after notice as provided therefor in said mortgage, at which sale the said J. A. Vick became the purchaser, at and for the sum of Five Hundred Dollars, this being the highest and best bid."

Section 171, Title 47, Code, is as follows:

"Notice of said sale shall be given in the manner provided in such mortgage or deed of trust, or in this Code in the county where the mortgagor resides and the land, or a part thereof, is located; but, if said mortgagor does not reside in the county where the land or any part thereof is located, then such notice must be published in the county where said land, or any material part thereof, is located; provided, that notice of all sales under powers of sale contained in mortgages and deeds of trust executed after July 1, 1936, where the amount secured is five hundred dollars or more, shall be given by publication once a week for three successive weeks in some newspaper published in the county in which such land or any portion thereof is situated, and said notice of sale must give the time, place and terms of said sale, together with a description of the property to be sold."

Section 172, Title 47, Code, provides:

"All sales of real estate, made under powers contained in mortgages or deeds of trust contrary to the provisions of this article, shall be null and void, notwith-standing any agreement or stipulation to the contrary."

It is conceded by appellants that no notice of foreclosure was run in any newspaper, and that the amount of the mortgage debt at the time of the foreclosure was in excess of $500.00.

Though not in the exact language, appellants earnestly insist that sections 171 and 172, supra, must be read in pari materia with sections 713 and 721, Title 7, Code, in order to demonstrate, first, that no newspaper was published in Coosa County, within the meaning of section 171, supra, at the time of the foreclosure and, second, to evidence a legislative intent of providing an alternative method of giving notice where no newspaper is published in the county of foreclosure.

■ Construed together, we think that the evidence in this case demonstrates that a newspaper was published in Coosa County, within the meaning of the statutes, at the time of the foreclosure. The evidence is without dispute that prior to 1938, there was a newspaper printed and published at Rockford, Coosa County, Alabama, and known as the Rockford Chronicle, and a newspaper printed and published at Goodwater, Coosa County, Alabama, known as the Goodwater Enterprise. Thomas S. Bugg purchased the Goodwater Enterprise in the year 1932 and the Rockford Chronicle in the year 1938. Mr. Bugg testified:

"Q. Where do you live? A. In Dadeville.

"Q. Tallapoosa County? A. Yes, sir.

"Q. Mr. Bugg at the present time and for some years past have you or not been editor of one or more newspapers in this, Coosa County? A. Yes, sir.

"Q. What papers were they? A. Goodwater Enterprise and Rockford Chronicle.

"Q. Approximately what years did you become editor of each of these papers? A. Well I bought the Enterprise from Mr. Summers in 1932, the spring of 1932 and I bought the Chronicle from Billy Smith right about 1937 or the first part, the spring of 1938, along those years, I don't remember the exact date.

"Q. Have you been editor of those papers continuously from the time you ac-

quired them? A. Yes, sir, separately and until they were combined later.

"Q. When you first acquired them they were published, they were printed and published separately? A. Yes, sir.

"Q. One in Goodwater and the other in Rockford? A. Yes, sir.

"Q. After you acquired the Rockford Chronicle, did you say about 1937 or 1938? A. Yes, sir.

"Q. Did you ever print it in this county or not? A. Well I printed it in Goodwater for a short while, I don't remember how long, just a very few months.

"Q. You were already, at that time you were printing the Goodwater Enterprise at Goodwater? A. Yes, sir.

"Q. And after you acquired the Rockford Chronicle you printed both of them in your newspaper plant at Goodwater? A. For a while.

"Q. Do you recall about when you ceased to print these papers there in Goodwater? A. I am not sure which year, 1937 or 8, but as I recall it was the spring of one of those years, it must have been 1938. However, it seems like it might have been 1937.

"Q. 1937 or 1938? A. Yes, sir.

"Q. You ceased at that time to print either of them in Goodwater? A. Yes, sir.

"Q. At that time you had a newspaper printing plant in Goodwater? A. Yes, sir.

"Q. What became of that newspaper printing plant at Goodwater? A. It was moved to Dadeville.

"Q. At the time you moved this plant over to Dadeville from Goodwater was there any other newspaper plant in Coosa County at that time? A. That was the only one, not a printing business left in Coosa County.

"Q. Has there been any other newspaper printing plant in Coosa County since you moved that away? A. I think not, I have no knowledge of it.

"Q. You spoke of the consolidation of the Rockford Chronicle and the Goodwater Enterprise, do you recall when that consolidation was made? A. The first issue in January, 1943.

"Q. January 1943? A. Yes, sir.

"Q. Do you recall what date in January? A. I don't recall the exact date.

"Q. To refresh your recollection—A. I am positive about the first issue, because I wanted to start the beginning of the year; I believe it stated the mast head of the paper.

"Q. Your recollection is it was the first issue in January? A. Yes, sir, I am positive about.

"Q. During all the time you published the Rockford Chronicle and likewise all of the time during which you published the Goodwater Enterprise and since the consolidation of them on down to the present time those newspapers have been printed as weekly newspapers have they not? A. Yes, sir, every week.

"Q. They were printed in the English language were they? A. Yes, sir.

"Q. Where did you enter the Rockford Chronicle into the United States mail? A. At Rockford.

"Q. That was all the time you were publishing that paper? A. Yes, sir.

"Q. Where did you enter the Goodwater Enterprise in the United States mail? A. In Goodwater.

"Q. At the Goodwater post office?

"Q. After the consolidation of the papers in January, 1943, when it became known as the Enterprise-Chronicle, where did you enter that in the United States mail? A. In Goodwater.

"Q. And all three of the papers, the Rockford Chronicle, the Goodwater Enterprise and then after the consolidation, the Enterprise-Chronicle have been entered in a post office in Coosa County? A. Yes, sir.

"Q. What rate or classification? A. Regular newspaper rate, second class.

"Q. I think it is probably clear, but I want to be sure, after you moved the printing plant from Goodwater to Dadeville, about 1937 or 1938, all these papers were actually printed in Dadeville? A. Yes, sir.

"Q. But they were actually published, that is by being put into the United States mail at the Rockford post office, or the Goodwater post office, as you have already indicated? A. Yes, sir.

"Q. Since you first acquired the Rockford Chronicle from Billy Smith there has been no newspaper plant in Rockford has there? A. No, sir.

"Q. And there was none in Goodwater except the one you bought from Mr. Summers? A. No, sir."

Section 713, Title 7, supra, reads as follows:

"The party in interest, or at whose instance the publication of notice is to be given by advertisement in a newspaper, may designate the newspaper in which such advertisement shall be made. If the officer charged with the duty of making the advertisement disregards such designation, and makes advertisement in some other paper, he must pay the costs thereof, and shall not be entitled to reimbursement; but all publications required by any law or mortgage or other contract to be published in a newspaper must be printed in whole or in part and published in the county in which the advertisement is published and must be published in a newspaper printed in the English language which has a general circulation in the county in which it is published, which newspaper shall have been mailed under the second class mailing privilege of the United States post office department from the post office where it is published for fifty two consecutive weeks. Provided, that if there is no newspaper printing plant in the county where the advertisement is published, the printing may be done in another county in the State of Alabama."

■ The language used in that part of section 713, supra, here pertinent is somewhat ambiguous and confusing. But construing the section as a whole, which we must do, we think it is clear enough that the legislature intended that all publications, that is to say notices, required by any law or mortgage or other contract to be published in a newspaper must be published in a newspaper printed (that is set up in type), in whole or in part and published in the county in which the advertisement (notice) is published and must be published in a newspaper printed in the English language which has a general circulation in the county in which it is published, which newspaper shall have been mailed under the second class mailing privilege of the United States Post Office Department from the post office where it is published for fifty-two consecutive weeks. Provided, that if there is no newspaper printing plant in the county where the advertisement is published, the printing (setting up in type) of the newspaper may be done in another county in the State of Alabama.

■ That such was the intent of the legislature is made clear when the distinction between "print" and "publish" is kept in mind. A newspaper is published at the place where it is entered in the post office and where it is first put in circulation, and not at the place where it is printed (set up in type). See, Bardwell et al. v. Town of Clinton, et al., La.App., 180 So. 148; Report of the Attorney General 1934–1936, pp. 364, 365. The proviso, the last sentence in section 713, supra, construed as we have construed it, gives a clear meaning to the entire section.

So construed, the evidence clearly indicates that there was a newspaper published in Coosa County at the time of the foreclosure in question, and that the foreclosure proceeding was void—that is, voidable on direct attack.—Appelbaum v. First National Bank of Birmingham, 235 Ala. 380, 179 So. 373.

Appellants further insist that they should not be held liable for rent or royalty payments received by them prior to one year before this suit was commenced, and rely upon section 949, Title 7, Code, and the cases of Dozier v. Mitchell, 65 Ala. 511, and Cornelius v. Bishop, 205 Ala. 503, 88 So. 592.

In its decree declaring the mortgage foreclosure null and void and that appellee had the equitable right to redeem, the trial court ordered the register to hold a reference to ascertain, among other things, the rents, royalties and profits the

254

mortgagees in possession had received since the law day of the mortgage.

The register in making his report included certain rents or royalties received by the mortgagees prior to one year before this suit was commenced. The report of the register was ordered laid over for five days for exceptions. No exceptions were filed, and nowhere in the record does it appear that appellants took any action whatever to have these erroneous items excluded from consideration. No objection having been urged in the court below, none is available for the first time on appeal to this Court.—Jones v. Moore, 215 Ala. 579, 112 So. 207. See, also, Equity Rules 85, 86, 87 and 88, Code 1940, Tit. 7 Appendix.

It appears that the parties considered that royalties came within the purview of section 949, Title 7, Code of 1940,—a matter which we find unnecessary to decide.—Goodyear Tire & Rubber Co. of Ala. v. Gadsden Sand & Gravel Co., 248 Ala. 273, 27 So.2d 578.

Affirmed.

BROWN, SIMPSON and STAKELY, JJ., concur.